UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MACROMEX SRL,

                Plaintiff,

v.

GLOBEX INTERNATIONAL, INC.,

                Defendant.

Case No. 08-cv-00113-SAS

**MEMORANDUM IN SUPPORT OF CROSS-PETITION
OF GLOBEX INTERNATIONAL, INC. TO
VACATE A FINAL ARBITRATION AWARD**

Stanley McDermott III
Sarah J. Sterken
DLA PIPER US LLP
1251 Avenue of the Americas
New York, New York  10020
T (212) 335-4695
F (212) 884-8595
stanley.mcdermott@dlapiper.com
sarah.sterken@dlapiper.com

*Counsel for Globex International, Inc.*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1
PROCEDURAL BACKGROUND .............................................................................................. 3
THE BACKGROUND FACTS AND LAW ............................................................................... 4
      The Illogical and Irrational Damages Award .................................................. 4
THE MISAPPLICATION OF UCC § 2-614 ............................................................................. 6
CONCLUSION ........................................................................................................................... 11

**TABLE OF AUTHORITIES**

Page

**CASES**

*Goldman v. Architectural Iron Co.*,
    306 F.3d 1214 (2d Cir. 2002) .................................................................................. 3

*Merrill Lynch, Pierce, Fenner & Smith v. Bobker*,
    808 F.2d 930 (2d Cir. 1986) ................................................................................ 3, 5

*Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*,
    497 F.3d 133 (2d Cir. 2007) .................................................................................. 3

*Wallace v. Buttar*,
    378 F.3d at 182 (2d Cir. 2004) .............................................................................. 3

**STATUTES**

9 U.S.C. § 10 .................................................................................................................... 1

9 U.S.C. § 10(a) ............................................................................................................... 3

UCC § 2-613 .................................................................................................................... 7

UCC § 2-614 ............................................................................................................*passim*

UCC § 2-615 .................................................................................................................... 7

UCC § 2-615(a) ................................................................................................... 8, 10, 11

**PRELIMINARY STATEMENT**

In accordance with 9 U.S.C. § 10, respondent-cross-petitioner Globex International, Inc. ("Globex") respectfully requests that the Court vacate a final arbitration award that is the result of the sole arbitrator's disregard of basic legal principles and the applicable law. Globex submits this memorandum in support of its cross-petition to vacate the award and in opposition to the petition of Macromex Srl ("Macromex") to confirm the award. (Globex also submits herewith the Declaration of Sarah J. Sterken attaching relevant exhibits ("Sterken Ex."). Although the standard to vacate an award is admittedly high, as explained below this case meets that high standard.

Globex is a New-York-based exporter of frozen poultry products. Macromex is a Romanian chicken merchant. In April 2006, in a series of sale-and-purchase contracts, Globex sold to Macromex 112 ocean-shipping containers of US-origin frozen chicken leg quarters. The contracts were subject to the United Nations Convention on Contracts for the International Sale of Goods ("CISG"). The "CIF Constanta, Romania" delivery term required Globex to ship the containers to Constanta, Romania's largest port. Globex was shipping those containers to Constanta when, on June 2, 2006, the Romanian government suddenly announced an import ban that prohibited the import of US chicken into Romania as of June 7, 2006. Globex reacted on an emergency basis to ship 20 more containers during the short interim period ahead of the ban, leaving 42 containers unshipped when the ban took effect.

After Globex terminated the contracts due to the import ban Macromex demanded arbitration alleging that Globex's failure to ship the 42 shut-out containers was a breach of contract. The arbitration was conducted by Philip O'Neill, Esq., in accordance with the International Dispute Resolution Procedures of the International Centre for Dispute Resolution ("ICDR"). On August 7, 2007, the arbitrator issued an Interim Award ("First Interim Award") finding Globex

in breach of contract. The arbitrator found that notwithstanding the ban on US chicken, Globex had a purported "substituted performance" duty that required it to ship the 42 containers shut out by the ban to a country *other than Romania* notwithstanding the CIF Romania shipment terms.

In that First Interim Award the arbitrator directed Globex to pay net-lost-profit damages of $608,323 based on *Romanian market prices, even though the import ban prohibited shipment to Romania*. In other words, the arbitrator awarded Macromex net-lost-profits that Macromex could *never* have realized due to the ban. That damages award ignores basic legal principles. It is illogical and indeed irrational. It cannot be reconciled with the arbitrator's ruling that Globex was in breach for failing to ship the containers to a country other than Romania, where market prices were significantly lower. In short, there is no conceivable justification for awarding *Romanian* market damages for breach of a perceived duty to ship *elsewhere*, due to an import ban *that prevented shipment to Romania*.

That irrational damages award aside, the liability ruling also manifestly disregards the governing law concerning the CIF shipment terms and the UCC provisions governing substituted performance. Because CISG has no provision imposing a "substituted performance" duty, the arbitrator purported to draw an analogy to UCC § 2-614. But in doing so the arbitrator manifestly disregarded both the text and the Official Uniform Comment of UCC § 2-614, thereby reaching a result precluded by § 2-614. As the Official Uniform Comment explains, UCC § 2-614 imposes a duty of "substituted performance" only as to "incidental" logistical matters that do not "go to the heart" of the parties' contract. A Romanian import ban that wholly prevents CIF shipments to Romania does not conceivably concern a merely "incidental" matter and it goes to the heart of the contracts.

Given the insupportable damages and liability rulings, Globex sought reconsideration. The arbitrator accepted Globex's application and conducted a further hearing. But he then issued

2

a superseding Interim Award ("Second Interim Award")—making a few changes said to be non-substantive—that reinstated the damages and liability rulings, thereby compounding the injustice reflected in the First Interim Award.

In addition to the four statutory grounds for vacating an arbitration award under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a), an arbitration award may be vacated "if it exhibits a 'manifest disregard of the law.'" *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007) (citing *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002)). While the manifest-disregard-of-the-law doctrine requires an "extremely deferential" standard of review, an arbitrator's decision "is not totally impervious to judicial review." *Porzig*, 497 F.3d at 139. If the petitioner demonstrates that "(1) the Arbitrators knew of a governing legal principle yet re-fused to apply it or ignored it altogether, and (2) the law ignored by the Arbitrators was well-defined, explicit, and clearly applicable to the case," an award may be vacated. *Porzig*, 497 F.3d at 139 (citing *Wallace v. Buttar*, 378 F.3d 182,189 (2d Cir. 2004)). Moreover, the courts will vacate an arbitration award grounded in the sort of "obvious" error evident in the illogical damages ruling that would be "readily and instantly perceived by the average person qualified to serve as arbitrator." *Merrill Lynch, Pierce, Fenner & Smith v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986). There is "no colorable justification" (*Wallace*, 378 F.3d at 193) for an award that the arbitrator got woefully wrong and then refused to correct.

**PROCEDURAL BACKGROUND**

The arbitration consisted of hearings at which the parties testified followed by post-hearing briefs. (*See* Sterken Decl. Exs. 3-6.) On August 7, 2007, the arbitrator issued the First Interim Award granting Macromex the Romanian-market damages based on Globex's failure to provide a "substituted performance" outside Romania in accordance with UCC § 2-614. (*See*

3

Sterken Decl. Ex. 7.) That led Globex, on August 20, 2007, to file a request for reconsideration in accordance with the ICDR Procedures (Sterken Decl. Ex. 8), and the arbitrator's agreement, on August 27, 2007, to hear Globex's application (Ex. 9). There followed further briefing by the parties (Sterken Decl. Ex. 10), a hearing on October 9, 2007 (Ex. 11) at which the arbitrator and counsel addressed the alleged deficiencies in the First Interim Award, and further letters to the arbitrator concerning the illogical damages award (Ex. 12). On October 23, 2007, the arbitrator issued a Post-Hearing Order No. 1 ("Post-Hearing Order") (Sterken Decl. Ex. 13) and the Second Interim Award (Ex. 13). The Post-Hearing Order directed certain revisions to the First Interim Award that according to the arbitrator produced no substantive change in the result. The Second Interim Award (including those revisions) provides the grounds for Globex's cross-petition.

The arbitrator then issued a Final Award in which he awarded Macromex pre-award interest, attorney's fees (amounting to $161,752.34) consisting of 25% of the damages awarded against Man based on the 25% contingency-fee terms of Macromex's legal-services contract with its lawyers, and all arbitration costs. (Sterken Decl. Ex. 15.) That yields a total award of $885,982.92. As we further explain, the Court should vacate the Final Award forthwith. But even if the Court were not to vacate the liability ruling it would still have to vacate the damages ruling and remand the matter to the arbitrator for a proper calculation of damages based on an alternative destination other than Romania (with a corresponding reduction of the attorney's fees and interest based on the damages award).

## THE BACKGROUND FACTS AND LAW

### The Illogical and Irrational Damages Award

The illogical and irrational damages award is found in the second paragraph of page 11 of the Second Interim Award. (*See* Sterken Decl. Ex. 13.) The arbitrator states, correctly, that

"Article 74 of the CISG provides the applicable standard for the damages claim asserted by Buyer." CISG Article 74 provides that "[d]amages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other as the consequence of the breach." By awarding net-lost-profits based on Romanian market conditions, the arbitrator simply ignored that provision of CISG Article 74. Net-lost-profits suffered by Macromex as a consequence of "the breach"—*i.e.*, the failure to ship to an *alternative* destination—must necessarily have been those net-lost-profits in a country *other than Romania* where Globex might have shipped the containers, not *in Romania*, the closed market where Globex could not ship the containers.[1] This is just the sort of obvious error that would be "readily and instantly perceived by the average person qualified to serve as arbitrator" (*Merrill Lynch,* 808 F.2d at 933).

The only record evidence adduced by Macromex of market prices in other countries concerned Turkey and the Republic of Georgia. In Turkey net-lost-profits would have amounted to $401,400. (*See* Sterken Decl. Ex. 3 at 11 n.1.) It was common ground, however, that Globex did not have to ship to Turkey because it had an exclusive sales agent there. In Georgia net-lost-profits would have amounted to $379,890. (*See* Sterken Decl. Ex. 11 (last 4 pages). The arbitrator ignored that evidence and awarded damages of $608,323 that should not have exceeded $379,890, assuming Globex owed a duty of substituted performance grounded in UCC § 2-614.

---

[1] While ignoring the first sentence of CISG Article 74, the arbitrator then proceeded to misconstrue the second sentence of CISG Article 74 which provides that "[s]uch damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract." According to the arbitrator "Buyer is entitled to lost profits that were foreseeable at the time of entry into the contracts" Under Article 74, however, foreseeable damages if any are simply a cap on actual damages. The question of foreseeable damages has nothing to do with damages resulting from the import ban that was wholly *unforeseen* when the contracts were concluded. And if any damages based on a duty to render substituted performance could nevertheless have been foreseen (which of course they could not), those damages could only have been foreseen in the alternative-shipment destination where the goods *could* have been shipped, not in Romania where the goods *could not be shipped*.

## THE MISAPPLICATION OF UCC § 2-614

The liability ruling also reflects the arbitrator's manifest disregard of the CIF shipment terms and the governing CISG and UCC law.  It is common ground that the path to decision is charted in CISG Article 7(2) and leads to UCC § 2-614.  CISG Article 7(2) provides that:

> Questions concerning matters governed by this Convention which are not expressly settled in it are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, in conformity with the law applicable by virtue of the rules of private international law.

CISG Article 7(2) thus prescribes a three-step sequential analysis.  One looks first to the text of CISG.  If that does not answer the question, one looks to the general principles on which CISG is based.  And if that does not answer the question, one must decide the matter *"in conformity with the law applicable by virtue of the rules of private international law,"* in this case the UCC.

Like the UCC (§ 2-615), CISG Article 79(1) relieves a party of liability if a *force majeure* event prevents performance:

> A party is not liable for a failure to perform any of his obligations if he proves that the failure was due to an impediment beyond his control and that he could not reasonably be expected to have taken the impediment into account at the time of the conclusion of the contract or to have avoided or overcome it or its consequences.

CISG Article 79(1) does not mention substituted performance, however, nor are there relevant general principles concerning substituted performance.

That led the parties and the arbitrator to the "private international law" codified in the "substituted performance" provisions of UCC § 2-614.  The problem is that while the arbitrator followed CISG Article 7(2) to reach UCC § 2-614, he did not apply either the text or the Official Uniform

6

Comment of UCC § 2-614 to the facts of the case, thereby impermissibly disregarding the law reflected in CISG Article 7(2) and UCC § 2-614.[2]

The liability ruling and the arbitrator's misapplication of CISG Article 7(2) and UCC § 2-614 are found in subpart (c) of the Second Interim Award at 9-11 ("Interpretation Aided by Sources Outside the Convention"). While purporting to look to UCC § 2-614 to determine whether Globex owed a duty of substituted performance under CISG Article 79, the arbitrator made no effort to actually apply it. It is evident that UCC § 2-614 simply afforded the arbitrator a pretext for the result he wanted to reach. UCC § 2-614(1) states that:

> Where without fault of either party the agreed *berthing, loading, or unloading facilities* fail or an agreed *type of carrier* becomes unavailable or the agreed *manner of delivery* otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted.

The Official Uniform Comment to UCC § 2-614(1) explains its difference from the force majeure section, UCC § 2-615, that follows it. As ¶ 1 of the Official Uniform Comment to § 2-614 states:

> This section [2-614] appears between Section 2-613 on casualty to identified goods and the next section [2-615] on excuse by failure to presupposed conditions, both of which deal with excuse and complete avoidance of the contract where the occurrence or non-occurrence of a contingency which was a basic assumption of the contract makes the expected performance impossible. *The distinction between the present section and those sections lies in whether the failure or impossibility of performance arises in*

---

[2] The arbitrator also took note of the [UN] Secretariat Commentary to CISG Article 79, § 7, the last sentence of which states that "a party may be required to perform by providing what is in all the circumstances of the transaction a *commercially reasonable substitute* for the performance which was required under the contract." Resorting to CISG Article 7(2), the arbitrator sought to "analogize" the "substituted performance" rule of UCC § 2-614 to illuminate the meaning of the "commercially reasonable substitute" wording of the Commentary. (*See* Sterken Decl. Ex. 13 at 7 (top paragraph)). The problem is not the analogy to UCC § 2-614 but rather the fact the arbitrator proceeded to disregard the text and Official Uniform Comment to UCC § 2-614.

7

>   *connection with an incidental matter or goes to the very heart of the agreement*.

A Romanian import ban precluding CIF Romania shipments under contracts between an American seller who sold goods to a Romanian buyer for shipment only to Romania cannot possibly be treated as an "incidental matter" rather than one "going to the heart" of the contracts, especially when UCC § 2-615(a) specifically excuses performance prevented by "governmental regulation" such as the Romanian import ban.

Tellingly, neither the First Interim Award nor the Second Interim Award even mentions the CIF Romania shipment terms of the contracts. As the submissions showed, the CIF term is a fundamental widely-recognized term of international purchase-and-sale contracts that requires the seller to ship the goods *to the named port of destination*. (*See* Sterken Decl. Ex. 8 at 3-6) (explaining the CIF shipment term, Incoterms 2000, UCC § 2-320(1), and CISG Articles 30 and 32(2).) The CIF term prohibits the seller from shipping the goods somewhere else. As the First Interim Award reveals, the arbitrator did not even realize that the contracts included the CIF Romania terms; he referred in a single sentence only to Macromex's *address* in the contracts.[3] In the Second Interim Award the arbitrator deleted that tell-tale sentence, ostensibly as a "clarification," but without saying anything about the CIF Romania shipment term.[4] As a result both the First and Second Interim Awards ignore the CIF Romania shipment term.

---

[3]  In the First Interim Award (Sterken Decl. Ex. 8 at 10), the arbitrator stated that "the parties to the Contracts in question did not specify whether the chicken could be shipped to Buyer at another country besides Romania; they only stated with respect to shipment to Buyer that its address was in Romania." The arbitrator was referring to the "Ship To" box in the upper right corner of the Contracts specifying Macromex's address. (*See* Sterken Ex. 2.) He ignored the "CIF Constanta, Romania" delivery term in the body of the contracts that required shipment to Romania.

[4]  *See* Sterken Decl. Ex. 13 (Post-Hearing Order at 1(1) ("In addition, clarification is also provided on page 8 by the deletion of one sentence")). That "deletion," hardly a "clarification," removed from the Second Interim Award the sentence in the First Interim Award revealing that the arbitrator had ignored the CIF Romania shipment term when reaching his decision.

The arbitrator's liability ruling is found in the paragraph at the top at the top of page 11:

> However, the inquiry does not end here in searching for commercially reasonable alternatives. Buyer raised the prospect of accepting delivery of the product elsewhere to make subsequent shipment possible. Another American supplier facing the same Romanian ban as Seller shipped to another port. While that particular port may not have been a viable alternative for Seller, the evidence made clear there were ports where exclusivity arrangements would not have precluded such delivery. It was Seller's duty to do so here and it failed to do so, preferring to pocket the profit available in a market experiencing a dramatic rise in prices. In doing so Seller misappropriated a profit that should have been made available to Buyer through an alternative shipment destination. The law does not countenance such a result. Accordingly, Buyer is entitled to damages a remedy. (Sterken Decl. Ex. 7 at 11.)

The arbitrator's decision is not simply contrary to UCC § 2-614. It *ignores* UCC § 2-614. It is premised on a substituted-performance "duty" that is wholly divorced from the *text* and *official commentary* of UCC § 2-614. And if there was no duty, then Globex could not misappropriate a profit otherwise to be realized by Macromex (outside Romania). That another American supplier (Tyson Foods) shipped product to Turkey (for reasons not explained) is irrelevant in the absence of a substituted-performance duty *actually imposed by the text and commentary of UCC § 2-614*.

The arbitrator ignored the fact that if he was going to lift UCC § 2-614 out of the UCC to apply it by analogy under CISG, then CISG Article 7(2) required him to decide the matter "*in conformity with*" UCC § 2-614. But there is no suggestion in the First Interim Award (or the Second Interim Award) that the arbitrator actually *considered* whether the substituted-performance "duty" complied with the text and official commentary of § 2-614.[5] The arbitrator could

---

[5] In the First and Second Interim Awards (at 10) the arbitrator stated that the approach of using UCC § 2-614 by analogy "justified invoking American case law interpreting UCC § 2-614," but the cited cases are not remotely analogous to the effect of the Romanian import ban on the CIF Romania shipment term and the arbitrator did not attempt to suggest (nor could he

not simply conclude that because UCC § 2-614 requires substituted performance in certain circumstances, he could generally impose a substituted-performance "duty" under CISG *without taking account of the limitations inherent in UCC § 2-614*. That is not simply legal error; it is manifest disregard of what the governing law (CISG Article 7(2) and UCC § 2-614) required the arbitrator to do.

 Revealingly, the arbitrator did not even attempt to fit the facts to the wording of UCC § 2-614 or the Official Uniform Comment to § 2-614. The arbitrator did not suggest—nor could he have plausibly suggested—that the import ban that prevented a CIF shipment to Romania was tantamount to a failure of "*berthing, loading, or unloading facilities*" or "*an agreed type of carrier*" or an "*agreed manner of delivery*" (UCC § 2-614). The arbitrator did not suggest—nor could he plausibly have suggested—that *CIF shipments to Romania prevented by the Romanian import ban* were merely "*incidental* matters" not at the heart of the contracts (Official Uniform Comment to UCC § 2-614). The arbitrator, in short, imposed a broad-brush duty of substituted performance by drawing an analogy to UCC § 2-614, while disregarding the actual meaning and limited scope of § 2-614. *That* result is one that the law—*i.e.*, the manifest-disregard-of-the-law doctrine—does not countenance.

 Finally, also revealing are the two revised sentences on page 10 of the Second Interim Award. (*See* the blue highlighting in Sterken Ex. Decl. 14 at 10.) In that passage the arbitrator, referring to the use of the UCC to illuminate the meaning of the "commercially reasonable substitute" wording of the Secretariat Commentary (*see* note 2 *supra*), stated that "[s]uch language is found in UCC § 2-614, to which UCC § 2-615 is expressly subject." Had the arbitrator, however, not wholly disregarded the Official Uniform Comment to UCC § 2-614, he would have

---

plausibly do so) that these cases dictated the result that he reached notwithstanding the text and official commentary of UCC § 2-614.

realized the differences between §§ 2-614 and 2-615. The "distinction" between the two sections, the Comment explains (*see* quotation *supra* at 7-8), depends, as noted, on whether "the failure or impossibility of performance arises in connection with an incidental matter or goes to the heart of the agreement." The Romanian import ban prohibiting the CIF shipments to Romania goes to the heart of the agreement, especially when § 2-615(a) expressly excuses a seller that cannot perform the contract due to its good-faith compliance with a "governmental regulation" such as the import ban.

## CONCLUSION

Cross-petitioner Globex respectfully urges the Court:

A   To grant Globex's cross-petition and vacate the Final Award.

B   Alternatively, to vacate parts (1), (2), and (3) of Section C of the Final Award that direct Globex to pay Macromex the Romanian market damages and corresponding interest and attorney's fees, and remand the matter to the arbitrator to determine Macromex's recoverable damages based on market prices in the Republic of Georgia.

Dated: New York, New York
       February 12, 2008

DLA PIPER US LLP

By: _____
Stanley McDermott III
Sarah J. Sterken
1251 Avenue of the Americas
New York, New York 10020
T (212) 335-4695
F (212) 884-8595
stanley.mcdermott@dlapiper.com
sarah.sterken@dlapiper.com

*Counsel to Globex International, Inc.*