UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MACROMEX SRL,

                      Plaintiff,

v.

GLOBEX INTERNATIONAL, INC.,

                      Defendant.

Case No. 08-cv-00114-SAS

## REPLY MEMORANDUM OF CROSS-PETITIONER GLOBEX INTERNATIONAL, INC. IN SUPPORT OF CROSS-PETITION TO VACATE ARBITRATION AWARD

Stanley McDermott III
Sarah J. Sterken
DLA PIPER US LLP
1251 Avenue of the Americas
New York, New York 10020
T (212) 335-4695
F (212) 884-8595
stanley.mcdermott@dlapiper.com
sarah.sterken@dlapiper.com

*Counsel for Globex International, Inc.*

**PRELIMINARY STATEMENT**

The opposition memorandum ("Opp'n") of Macromex Srl ("Macromex") demonstrates why this Court should grant the cross-petition of Globex International, Inc. ("Globex") and vacate the arbitration award. Rather than defending the award, Macromex relies for the most part on the standard of review that "even a 'barely colorable' justification for the outcome reached will save an arbitral award." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 390 (2d Cir. 2003). But as we further explain, augmenting arguments in Globex's memorandum supporting its cross-petition ("Cross-Pet."), the award cannot be saved even under that lenient standard.

As to damages, there can be no "barely colorable" justification for an illogical award of Romanian-market damages for breach of a purported obligation to ship the goods to a country other than Romania due to the Romanian import ban. Macromex's suggestion that the damages award nonetheless "has both a logical rationale and a rational logic" (Opp'n 6) is itself illogical and irrational. We address the damages award first because it exposes so graphically the arbitrator's disregard of the governing law to reach an indefensible result.

As to liability, Macromex does not provide a "barely colorable" justification for the purported substituted-performance duty notwithstanding the arbitrator's manifest failure to apply either UCC § 2-614 or the Official Uniform Commentary ("Official Commentary") to § 2-614. The arbitrator was not free, as Macromex suggests (Opp'n 10), simply to disregard the Official Commentary to § 2-614 that (no less than the text of § 2-614) precludes the arbitrator's ruling. What is most telling is Macromex's failure to provide a *reasoned* "barely colorable justification" for the award that is wholly contrary to UCC § 2-614 and the Official Commentary to § 2-614— the law that Macromex concedes is "clear, and in fact explicitly applicable to the matter before the arbitrator." *Duferco*, 333 F.3d at 390.

Nor can Macromex seek safety in the notion that an award cannot be vacated "for an erroneous application of the law if a proper application of law would have yielded the same result." *Duferco*, 333 F.3d at 390. Or where an award contains "more than one plausible reading" and "at least one of the readings yields a legally correct justification for the outcome." *Id.* Or where despite the arbitrator's deficient explanation "a justifiable ground for the decision can be inferred from the facts of the case." *Id.* Nor is there any doubt that the arbitrator knew and understood that the relevant CISG Articles and UCC sections provided the rules of decision. The short of the matter is that these rules were "misapplied, yielding an improper result," *bearing in mind* that "even a 'barely colorable' justification for the outcome reached will save an arbitrable award." *Id.* at 391.

**ARGUMENT**

**A.    The Damages Award Must Be Vacated.**

According to Macromex:

> Having rejected Macromex's offer to cure, Globex became liable for breach of the CIF Constanza contract. Damages for such a breach, of course, are measured by the market in Constanza and not by the market at a place where Globex might have shipped the chicken, but chose not to do so. The arbitrator thus properly awarded damages measured by the market in Constanza. Accordingly, the damages award was entirely rational, logical and justified.

(Opp'n 6.) This is not correct. By "Macromex's offer to cure" Macromex means its willingness to accept delivery of the goods shut out by the ban in a country other than Romania. If Globex was indeed required to render substituted-performance outside Romania—notwithstanding the contrary thrust of UCC § 2-614—then the breach of that obligation could not give rise to damages "measured by the market in Constanza" where Globex, due to the import ban, *could not have shipped the goods*. That Globex purportedly "chose" not to ship the goods to an alternative market outside Romania is irrelevant.

2

CISG Article 74 provides for the calculation of damages in this case that:

> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.

(Sterken Decl. Ex. 1.) The only damages that Macromex might have sustained "as a consequence of" Globex's failure to render substituted performance had to be in a country outside Romania where Globex might legally have shipped the goods. On the record evidence (Cross Pet. at 5) that country is Georgia, where Macromex's net lost profits would have amounted to $379,990 (Ex. 11), far less than the irrelevant Romanian-market damages.

Macromex cannot either "justify" or ignore the arbitrator's failure to apply the damages calculation required by CISG Article 74 by virtue of the arbitrator's failure to properly apply Article 74. Legal error cannot provide "barely colorable" justification for the wrong outcome. *Duferco*, 333 F.3d at 391. Again Macromex relies upon the arbitrator's incorrect statement to insist that the arbitrator is right. Here is what the arbitrator said:

> Article 74 of the CISG provides the applicable standard for the damages claim asserted by Buyer. Basically, under it Buyer is entitled to lost profits caused by Seller that were foreseeable at the time of entry into the Contracts. *The damages requested by Buyer meet the Article 74 standard and are adequately evidenced.*

(Opp'n 6.) But CISG Article 74 does not entitle the Buyer "to lost profits caused by Seller that were foreseeable at the time of entry into the Contracts." As the second sentence of Article 74 states, *foreseeable damages* are simply a *cap* on *actual damages* sustained as a consequence of the breach. (*See* Cross-Pet. 5 n.1.) Moreover, there is no conceivable basis for applying the foreseeable-damages rule here. Neither Globex nor Macromex could have foreseen at the time the contracts were concluded the import ban that abruptly closed Romanian ports to U.S. chicken

3

products. Furthermore, even if Globex had foreseen the ban, which of course it could not have done, it could not have foreseen *what is wholly illogical and indeed impossible*, *i.e.*, that Macromex would experience lost profits *in Romania* on account of an import ban that *prevented Globex from shipping the goods to Romania.*

Misapplication of CISG Article 74 that is so pronounced is not a question of the arbitrator's "judgment." (Opp'n 6.) Far from inviting this Court, in Macromex's words, to "substitute its judgment for that of the arbitrator" (*id.*), Globex urges the Court to vacate the illogical damages award because there is simply no "plausible reading" of it that affords "even a barely colorable justification" for damages that CISG Article 74 prohibits. *Duferco*, 333 F.3d at 392. Because the damages award is incurably flawed there is "a clear demonstration that the [arbitrator] intentionally defied the law," by disregarding the law that the arbitrator admits applied to the problem before him. *Id.* at 390-93.

Macromex's suggestion that "the arbitrator was entirely justified in making Macromex whole by awarding Macromex 'the benefit of its bargain,' *i.e.*, the $608,323 profit that Globex misappropriated" (Opp'n 7) is also fatally flawed. Macromex cannot be made "whole" for profits lost in Romania. Because of the ban such profits could never have been realized in Romania. Macromex could not and did not have "the benefit of [any] bargain" in Romania for goods shut out of Romania by the import ban. Even as clearly as that, Globex could not have "misappropriated" any Romanian "profits" of $608,323 (or any other amount) for goods that were not permitted to and did not enter Romania.[1]

---

[1] The arbitrator also disregarded CISG Article 76(1) and (2). CISG Article 76(1) states that "if the contract is avoided and there is a current price for the goods, the party claiming damages may, if he has not made a purchase or resale under article 75, recover the difference between the price fixed by the contract and the current price at the time of avoidance as well as any further damages recoverable under article 74." CISG Article 76(2) provides that "for the

4

Also wrong is Macromex's further "defense" of the damages award. (Opp'n 8.) According to Macromex, (1) "Globex has not proven any rule of law that foreseeable damages in a substitute performance scenario are only to be measured by prices in the substituted marketplace"; and (2) Globex has not cited authority "that defines and/or makes explicit Globex's proposition that foreseeable damages in a substitute performance scenario are only to be measured by prices in the substituted marketplace." (*Id.*)

First, "foreseeable" damages is not the standard here. Rather the arbitrator was determining the actual damages purportedly incurred by Macromex "as a consequence of the breach" (CISG Art. 74), which according to the arbitrator was Globex's failure to ship to a country other than Romania. With that standard in mind, what authority does Macromex imagine? How could damages "in a substitute performance scenario" ever *not* "be measured by prices in the substituted marketplace"? What law (Macromex suggests none) could possibly justify damages for failure to provide substituted performance based anywhere *other than* the substituted marketplace where the buyer would have enjoyed the "benefit of its bargain," assuming of course there was such a bargain at all?

There is also, as noted above, no "scienter" rule reflected in *Duferco*. (Opp'n 8.) In *Duferco*, the Court of Appeals ruled that "[i]n order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability to the problem before him." 333 F.3d at 390. The question of intent is simply one of knowledge of a law that was not applied. *See Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 218 (2d Cir. 2002) ("The manifest disregard

---

purposes of the preceding paragraph, the current price is the price prevailing *at the place where delivery of the goods should have been made or, if there is no current price at the place, the price at such other place as serves as a reasonable substitute, making due allowance for differences in the cost of transporting the goods.*" As noted, the price at the only place where delivery

5

doctrine is not confined to that rare case in which the arbitrator provides us with explicit acknowledgement of wrongful conduct, however. * * * A court may find intentional disregard if the reasoning supporting the arbitrator's judgment 'strains credulity' or does not rise to the standard of 'barely colorable'" (citations omitted)). Here, there is no question that the arbitrator knew that CISG Article 74 applied to the problem before him, and there can be no "barely colorable" justification for the award of Romanian market damages for goods shut out of Romania due to the import ban. The award of Romanian market damages of $608,323 is demonstrably wrong and must therefore be vacated.

**B.     The Liability Ruling Must Be Vacated.**

We addressed damages first because the arbitrator's illogic and failure to apply CISG Article 74 are so evident. The underlying liability ruling is no less egregious and must also be vacated because it too manifestly disregards the governing law—UCC § 2-614 and its Official Commentary.

The arbitrator's failures are not obfuscated by Macromex's suggestion that it is "hypocrisy for Globex to now argue that the arbitrator disregarded the very law that Globex urged him to disregard." This statement is misleading and wrong. (Opp'n 10.) In Globex's view the text of CISG Article 79(1) was dispositive. But Globex also asserted, in the alternative, that if the arbitrator did not view Article 79(1) to be dispositive, then CISG Article 7(2) provided the rule for decision. In fact, the applicability of Article 7(2) in that event was common ground among the parties and the arbitrator. Yet the arbitrator disregarded the dictate of Article 7(2) which mandates that if one resorts to the rules of private international law (here the UCC), then the decision must be "in conformity with" those rules.

---

could have been made was that prevailing in the Republic of Georgia, where Macromex's net lost profits would have amounted to $379,990.

6

CISG Article 7(2) states that:

> Questions concerning matters governed by this Convention which are not expressly settled in it are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, *in conformity with the law applicable by virtue of the rules of private international law*.

There is no question that the arbitrator correctly applied CISG Article 7(2) to reach UCC § 2-614. (*See* Sterken Decl. Ex. 13 at 7, 9-10.) The problem is that the arbitrator then disregarded § 2-614 by ignoring its limited scope evident in both its text and Official Commentary. Comparing § 2-614 (the substituted-performance rule) and §§ 2-613 and 2-615 (the casualty and force majeure rules), the Official Commentary states that:

> This section [§ 2-614] appears between Section 2-613 on casualty to identified goods and the next section [§ 2-615] on excuse by failure to presupposed conditions, both of which deal with excuse and complete avoidance of the contract where the occurrence or non-occurrence of a contingency which was a basic assumption of the contract makes the expected performance impossible. *The distinction between the present section and those sections lies in whether the failure or impossibility of performance arises in connection with an incidental matter or goes to the very heart of the agreement.*

The arbitrator simply imposed a desired result—a substituted-performance duty—without explaining how or why the CIF Constanta Romania shipment terms that the import ban precluded could possibly be an "incidental matter" rather than one going "to the very heart" of contracts providing for CIF Romania. (*See* Ex. 13 at 11.) Indeed, the arbitrator's failure to provide *any* explanation of whether or how the CIF Romania term could be an incidental term is especially noticeable when juxtaposed to the detailed reasoning that led the arbitrator, in accordance with CISG Article 7(2), *to* the "private international law" found in § 2-614. But the arbitrator then failed to *apply* § 2-614 in the manner required by the UCC.[2]

---

[2] This point was discussed specifically with the arbitrator. During the rehearing counsel for Globex (Mr. McDermott) explained that the arbitrator was "foreclose[d]" from concluding

7

Thus, this is not a case like *Duferco* where even though an "explanation for an award is deficient or non-existent, [the court] will confirm it if a justifiable ground for the decision can be inferred from the facts of the case." 333 F.3d at 390. This Court also cannot infer an intent on the part of the arbitrator that would be legally wrong.[3] The dispositive facts—a Romanian import ban precluding performance of the CIF Romania shipment terms—are matters plainly "going to the heart" of the contracts that foreclose any substituted-performance duty based on UCC § 2-614. In contrast, the text of § 2-614 extends to incidental matters such as dock facilities, the type of carrier or the manner of delivery, matters not analogous (or ever said to be analogous) to a fundamental CIF shipment term frustrated by an import ban. *See* UCC § 2-320(1), (2) (requiring seller in CIF contract to ship goods *to the named destination*); *see also* Sterken Decl. Ex. 8 at 3-6 (citing additional authority explaining the significance of the CIF shipment term).

Globex does not "candidly admit" that the Official Commentary is not the law. (Opp'n 10.) In the footnote to which Macromex refers Globex compared the highly authoritative UCC Official Commentary to the far less significant CISG Secretariat Commentary. (Sterken Decl. Ex. 8 at 7.) The arbitrator was not "free to ignore [the UCC Commentary] if he so chose," when the Official Commentary is unquestionably an essential part of the UCC's fabric.

---

that Globex had a duty to render substituted performance under § 2-614 because § 2-614 applied only to incidental matters such as substituting one warehouse or dock for another, not to fundamental contract terms such as the CIF Romania shipment term. (Sterken Decl. Ex. 11 at 18-20.) Apparently recognizing this, the arbitrator said that: "Well, I'm not applying national law, one. I am trying to reason from national law. So I would take some issue with your characterization of what is being done." (*Id.* at 20-21.) Whatever the arbitrator might have viewed that distinction to mean, Mr. McDermott then explained that because the arbitrator was using CISG Article 7(2) to reach UCC § 2-614 he was required to decide the matter in conformity with § 2-614. (*Id.* at 21-24.) But the arbitrator ignored that fundamental requirement of CISG Article 7(2) and did not decide the matter in conformity with UCC § 2-614.

[3]   *See Rich v. Spartis*, -- F.3d --, 2008 WL 343330 (2d Cir. Feb. 8, 2008), in which the Court of Appeals ordered the district court to remand an award to the arbitration panel for clarification of an insufficiently explained decision to ensure that the decision would be legally correct.

8

Although Macromex asserts that the arbitrator "engaged in a painstakingly in-depth analysis of both the CISG and the UCC" (Opp'n 11), examination of the award shows that it lacks any analysis, much less an in-depth analysis, of the substituted-performance doctrine of UCC § 2-614 in the light of the import ban and the CIF Romania shipment terms *that the award never mentions.*

In imposing the substituted-performance duty, the arbitrator relies on three irrelevant things. First, the arbitrator states that "Buyer [Macromex] raised the prospect of accepting delivery of the product elsewhere to make subsequent shipment possible." (Sterken Decl. Ex. 13 at 11.) But Macromex's mere *willingness* to consider taking delivery elsewhere cannot possibly *require* Globex to ship elsewhere. Second, the arbitrator states that "[a]nother American supplier [Tyson Foods] facing the same Romanian ban as seller shipped to another port." (*Id.*) But that voluntary act, the motivation for which is unknown, cannot beget a *duty* on Globex's part based on UCC § 2-614. That Tyson decided to ship product to Macromex in Turkey (for reasons never explained) cannot possibly mean that § 2-614 required *Globex* to do so. Third, the arbitrator notes that whereas that Turkish port "may not have been a viable alternative, the evidence made clear that there were other ports where exclusivity arrangements would not have precluded such delivery." *Id.* But the mere existence of other ports in countries such as Georgia cannot impose a *duty* on Globex based on § 2-614 to ship to those ports notwithstanding the material contractual requirement of CIF Romania shipment terms expressly agreed between the parties.

These three factors—entirely bereft of any *analysis* of UCC § 2-614, its explanatory Official Commentary, or the significance of the CIF Romania contract terms never mentioned in the award—are pretexts for the result the arbitrator wanted to achieve. Lacking any grounding in the text of § 2-614, the Commentary to § 2-614, or the CIF Romania shipment terms, these

"facts" do not provide a "barely colorable" justification for the substituted-performance "duty" that impermissibly ignores the effect of the import ban on the CIF Romania shipment terms.

In sum, Globex sold chicken to Macromex, a Romanian merchant, on CIF Romania terms that required Globex to ship the product to Romania and nowhere else. Such CIF terms have long been fundamental, not incidental, terms of international purchase-and-sale contracts. No authority anywhere suggests otherwise. The import ban did not and could not—in accordance with UCC § 2-614 and its Official Commentary—require Globex to undo the CIF Romania shipment term and rewrite the contracts to ship the goods somewhere else. And there can be no "barely colorable" justification for an award that wholly ignores not only the impact of the import ban on the CIF shipment terms but also the text and Official Commentary to § 2-614.[4] The Court should rectify such serious injustice by vacating the award in its entirety.

## CONCLUSION

Cross-petitioner Globex respectfully re-urges the Court:

A. To grant Globex's cross-petition and vacate the Final Award.

B. Alternatively, to vacate parts (1), (2), and (3) of Section C of the Final Award that direct Globex to pay Macromex the Romanian market damages, interest and attorney's fees, and remand the matter to the arbitrator to determine Macromex's recoverable damages based on market prices in the Republic of Georgia.

Dated: New York, New York
       March 3, 2008

---

[4] Macromex's suggestion that Globex's cross-petition warrants Rule 11 sanctions (Opp'n 11-12) is groundless. Among other things Macromex's repeated invocation of the "barely colorable" standard reveals Macromex's awareness of the serious flaws infesting the award.

DLA PIPER US LLP

By: _____
Stanley McDermott III
Sarah J. Sterken
1251 Avenue of the Americas
New York, New York 10020
T (212) 335-4695
F (212) 884-8595
stanley.mcdermott@dlapiper.com
sarah.sterken@dlapiper.com

*Counsel to Globex International, Inc.*

11