UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                  :

MACROMEX SRL,                    :

         Plaintiff,          :

      - against -         :

GLOBEX INTERNATIONAL, INC.,   :

        Defendant.       :

                                    :
------------------------------------------------------------X

**OPINION AND ORDER**

**08 Civ. 114 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Macromex SRL ("Macromex") has petitioned for confirmation of an arbitral award against Globex International, Inc. ("Globex"), and Globex has cross-petitioned to have that award vacated. Globex makes two main arguments. *First*, Globex argues that the arbitrator's application of the Uniform Commercial Code's ("U.C.C.") substituted performance provision constituted manifest disregard of the law. *Second*, Globex argues that if the arbitrator's use of the U.C.C. is upheld, it was irrational to base the lost profit damages on the Romanian market, where Globex's product was banned, instead of a substituted location. For

-1-

the reasons discussed below, Globex's cross-petition is dismissed and the award is confirmed.

## II.    BACKGROUND

Globex is an American company that sells food products to countries around the world.[1]  Globex contracted to sell Macromex, a Romanian company, 112 containers of chicken parts to be delivered in Romania.[2]  That contract was governed by the United Nations Convention on Contracts for the International Sale of Goods ("CISG").[3]  The contract required that Globex make the final shipment by May 29, 2006.  However, by June 2, 2006, it had failed to ship sixty-two of the containers.

On June 2, 2006, the Romanian Government declared, without notice, that as of June 7, 2006, no chicken could be imported into Romania unless it was certified by the latter date.[4]  Between that announcement and June 7, 2006, Globex

---

[1]    *See* Interim Award ("Int. Award") at 1, Ex. 7 to 2/12/08 Declaration of Sarah J. Sterken, Counsel for Globex, in Support of Cross-Petition to Vacate Arbitration Award ("Sterken Decl.").

[2]    *See* Brief of Claimant Macromex to the Arbitrator ("Mac. AAA Brief") at 2, Ex. 4 to Sterken Decl.

[3]    *See* United Nations Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, 1489 U.N.T.S. 3.

[4]    *See* Post-Hearing Memorandum of Respondent Globex International, Inc. ("Globex Post-Hearing Mem.") at 1, Ex. 3 to Sterken Decl.  The purpose of

rushed out twenty of the remaining sixty-two containers it had contracted to sell.[5]

As of June 7, the remaining forty-two containers could not be shipped to Romania

due to that regulation. Macromex then brought arbitration proceedings against

Globex for breach of contract, demanding $608,323.00. Globex submitted to

arbitration and lost.

Globex's principal argument was a force majeure defense. Globex

argued that its delays in shipment were within the industry's informal standard of

flexibility.[6] The ban came within that period of flexibility without warning,

completely blocking Globex from shipping the remaining chicken to Macromex.

The arbitrator found that the delay in shipment itself was not a

fundamental breach.[7] Because the ban on importing chicken into Romania made

that non-delivery effectively indefinite, the arbitrator then examined whether

Globex was exempted from performance by CISG Article 79, which covers

excuses due to force majeure. That Article, as interpreted by the arbitrator,

_____

the certification is not entirely clear, but the ban was intended to halt the
importation of the avian flu virus. Neither party contends that Globex could have
certified its chicken in a reasonable amount of time.

[5]     *See id.* at 2.

[6]     *See id.* at 3. *See also* Int. Award. at 2-4.

[7]     *See* Globex Post-Hearing Mem. at 3.

-3-

contains four elements: 1) an impediment beyond the party's control, 2) unforeseeable by that party, 3) that could not be reasonably avoided or overcome, and 4) an allegation by that party that nonperformance was due to that impediment.[8]  The arbitrator found that Globex satisfied the first two elements, may have satisfied the fourth, but failed to satisfy the third.[9]

The arbitrator determined that the third element refers to the concept of substituted performance.  The arbitrator found the language of the contract precluded an interpretation as to the third element based solely on a reading of the contract.[10]  He therefore turned to two extrinsic sources: authorities within the CISG's scope, including its commentary and caselaw, and material outside the CISG, such as the U.C.C. and caselaw interpreting the U.C.C.[11]  The arbitrator found that the materials within the CISG were of limited use, but suggested that

---

[8]    *See id.* at 5.

[9]    *See id.* at 4-11.

[10]   *See id.* at 7.

[11]   The CISG permits the use of either authority in interpreting contracts. *See* CISG art. 7(2).  The arbitrator's decision to use the U.C.C. is not contested by Globex. *See* Memorandum in Support of Cross-Petition of Globex International, Inc. to Vacate a Final Arbitration Award ("Cross-Pet.") at 6 ("The problem is that while the arbitrator followed CISG 7(2) to reach U.C.C. § 2-614, he did not apply [it correctly] to the facts of the case . . . .").

-4-

Macromex's request for substituted performance was appropriate.[12]  By contrast, the arbitrator found that section 2-614 of the U.C.C. was dispositive of the issue.

The arbitrator held that section 2-614 requires commercially reasonable alternatives to performance.[13]  Macromex proposed that Globex ship to a port in Georgia, a nearby country.  The arbitrator noted that another of Macromex's American suppliers had accepted this offer, in the face of the same import ban.[14]  Globex, however, had refused, and instead took advantage of a contemporaneous jump in the market price of chicken.[15]

Having decided for Macromex, the arbitrator set damages at the Romanian market price for the undelivered chicken – namely, the $606,323.00 sought by Macromex.[16]  The arbitrator also shifted all costs for the proceedings and attorneys' fees to Globex.  The final award came to $876,310.58.[17]

----

[12]     *See* Int. Award at 9 ("Thus, under this approach [referring to materials within the CISG] Seller should have explored possible alternatives in this regard with Buyer, but failed to do so to Buyer's detriment and Seller's enrichment.").

[13]     *See id.* at 7-11.

[14]     *See id.* at 2.

[15]     *See id.* at 11.

[16]     *See id.*

[17]     *See* Final Award at 4, Ex. 15 to Sterken Decl.

Globex made a "request for interpretation" of the award on the same

issues it raises here: misuse of section 2-614 and miscalculation of the damages.[18]

The arbitrator doubted it had the power to revisit the substance of the award but

nonetheless decided that Globex's complaints were without merit.[19]  Macromex

then petitioned for confirmation of the award in this Court, and Globex cross-

petitioned to vacate that award.

## III.   LEGAL STANDARD

### A.    Interpretation of Law

If the parties so agree, a contract may be governed by the CISG.

Because the CISG is a self-executing treaty and the United States is a member, it is

binding on this Court as federal law.[20]  However, "[b]ecause there is virtually no

caselaw under the Convention, we look to its language and to 'the general

principles' upon which it is based."[21]  Further, "[c]aselaw interpreting analogous

provisions of Article 2 of the [U.C.C.], may also inform a court where the

---

[18]    *See* Request for Interpretation, Ex. 8. to Sterken Decl.

[19]    *See* Post-Hearing Order No. 1 at 1-2, Ex. 14 to Sterken Decl.

[20]    *See Delchi Carrier SpA v. Rotorex Corp.* 71 F.3d 1024, 1027 (2d Cir. 1995).  Romania is also a member.

[21]    *Id.* at 1027-28 (citing CISG art. 7(1)) (other citations omitted).

language of the relevant CISG provisions tracks that of the U.C.C."[22] This rule of interpretation also applies to arbitrators examining a contract providing for the application of the CISG as governing law.[23]

## B.    Vacatur of Award

The confirmation of an arbitration award is a summary proceeding that converts a final arbitration award into a judgment of the court.[24] "Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."[25] "A court is required to confirm the award unless a basis for modification or vacatur exists."[26] The Federal Arbitration Act ("FAA") lists

---

[22]    *Id.* at 1028 (noting that such caselaw "'is not per se applicable'" (quoting *Orbisphere Corp. v. United States*, 726 F. Supp. 1344, 1355 (Ct. Int'l Trade 1989))).

[23]    *See, e.g.,* Int. Award at 9-10.

[24]    *See Yusef Ahmed Algahanim & Sons v. Toys "R" Us*, 126 F.3d 15, 23 (2d Cir. 1997) (citing *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)).

[25]    *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997) (quotation marks omitted). *Accord Ono Pharm. Co. v. Cortech, Inc.*, No. 03 Civ. 5840, 2003 WL 22481379, at \*2 (S.D.N.Y. Nov. 3, 2003).

[26]    *Insurance Co. of N. Am. v. Ssangyong Eng'g & Const. Co.*, No. 02 Civ. 1484, 2002 WL 377538, at \*4 (S.D.N.Y. Mar. 11, 2002).

-7-

specific instances where an award may be vacated.[27]  In addition, the Second

Circuit has recognized that a court may vacate an arbitration award that was

rendered in "'manifest disregard of the law.'"[28]  However, "review for manifest

error is severely limited."[29]

Although "its precise boundaries are ill defined . . . its rough contours

are well known."[30]  To find manifest disregard, the Second Circuit held in *Duferco*

*Int'l Steel Trading v. T. Klaveness Shipping A/S* that the court must conduct a

three step analysis. *First*, the court must find that the arbitrator ignored a law that

---

[27]     The statutory grounds for vacatur listed in the FAA are: (1) the award
was procured by corruption, fraud or undue means; (2) the arbitrators exceeded
their powers or "so imperfectly executed [their powers] that a mutual, final, and
definite award upon the . . . matter submitted was not made;" (3) the arbitrator was
guilty of "misconduct in . . . refusing to hear evidence pertinent and material to the
controversy;" (4) the arbitrators exhibited "evident partiality" or "corruption;" or
(5) the arbitrators were guilty of "misconduct in refusing to postpone the hearing,
upon sufficient cause shown," or guilty of "any other misbehavior" that prejudiced
the rights of any party. *Ono*, 2003 WL 22481379, at *2 n.24; 9 U.S.C. § 10(a).
Globex does not argue that any of these provisions apply.

[28]     *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) (quoting *DiRussa
v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997)).

[29]     *Id.* (quoting *Government of India v. Cargill Inc.*, 867 F.2d 130, 133
(2d Cir. 1989)).  In *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333
F.3d 383, 389 (2d Cir. 2003), the court noted that "since 1960 we have vacated
some part or all of an arbitral award for manifest disregard in . . . four out of at
least 48 cases where we applied the standard."

[30]     *Duferco*, 333 F.3d at 389.

-8-

was clearly and explicitly applicable to the case.[31]  *Second*, the court must find that

the law was improperly applied, leading to an erroneous outcome.[32]  *Third*, the

court must find that the arbitrator acted with the subjective knowledge that she

was overlooking or misapplying the law.

"A federal court cannot vacate an arbitral award merely because it is

convinced that the arbitration panel made the wrong call on the law.  On the

contrary, the award 'should be enforced, despite a court's disagreement with it on

the merits, if there is a barely colorable justification for the outcome reached.'"[33]

In deciding whether to confirm an arbitration award, the court "should not conduct

an independent review of the factual record" to check if facts support the panel's

conclusion.  Rather, "[t]o the extent that a federal court may look upon the

evidentiary record of an arbitration proceeding at all, it may do so only for the

purpose of discerning whether a colorable basis exists for the panel's award so as

to assure that the award cannot be said to be the result of the panel's manifest

---

[31]     *See id.* at 389-90.

[32]     *See id.*

[33]     *Wallace*, 378 F.3d at 190 (emphasis in original) (quoting *Banco de
Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir.
2003)).

disregard of the law."[34]

## C.    Lost Profits

Under the CISG, when a contract is breached, plaintiff may "collect damages to compensate for the full loss. This includes . . . lost profits, subject only to the familiar limitation that the breaching party must have foreseen, or should have foreseen, the loss as a probable consequence."[35] The CISG allows damages to reach (although not exceed) the amount "which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract . . . as a possible consequence of the breach of contract."[36] Likewise, American law on lost profits supports the "general rule. . . that foreseeability should be assessed at the time of contracting," not at the time of breach.[37] This prevents either party from exploiting favorable changes of circumstances.

## IV.    DISCUSSION

### A.    U.C.C. § 2-614

---

[34]    *Id.*

[35]    *Delchi*, 71 F.3d at 1030.

[36]    CISG art. 74.

[37]    *Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 477 (2006) (also quoting several cases, the Restatement (Second) on Contracts, and Farnesworth on Contracts for this proposition).

-10-

Globex does not contest the arbitrator's decision to use the U.C.C. to help clarify the CISG,. Rather, Globex argues that the arbitrator misapplied the U.C.C. Globex argues that the official comment to the U.C.C. shows that section 2-614 is not intended to be applied to force majeure situations, which are covered instead by section 2-615.[38] The official comment to section 2-614 states in relevant part, "[t]he distinction between [these sections] lies in whether the failure or impossibility of performance arises in connection with an incidental matter or goes to the very heart of the agreement."[39] Globex argues that the country of delivery as specified in the Contract "goes to the very heart of the agreement."[40]

Section 2-614 is unambiguous. It covers unloading places that have "become unavailable" "without fault of either party."[41] While this may often be read to refer to specific facilities within a country, it is more than "barely colorable" to read this to include *a country's* facilities, blocked by regulation, when a nearby country's facilities are available. Indeed, as Macromex argues, there is no reason to overburden the significance of national ownership of a port

---

[38] *See* Cross-Pet. at 6-7.

[39] U.C.C. § 2-614 official cmt. 1 (1977).

[40] *See* Cross-Pet. at 8-9.

[41] U.C.C. § 2-614(1).

-11-

(assuming Seller will not have to sustain whatever greater docking and importation fees there may be at the port of another country).[42]

Globex instead argues that section 2-614 refers only to the technical details of contract performance. The official comment that Globex quotes, however, can easily be read to confirm the arbitrator's application. The comment's distinction between incidental matters and those going to the heart of the contract is better read as "surmountable impediments" and "insurmountable impediments." Nonperformance without substitution is only justified if the impediment is totally insurmountable, not just that it affects an important element of the contract. The comment cites to two cases as illustrative. In *International Paper v. Rockefeller*, the specific stand of trees Buyer wanted was accidentally destroyed. Because the requested product no long existed, the impediment to performance was insurmountable.[43] In *Meyer v. Sullivan*, however, Seller was to deliver certain goods to Buyer, but war regulations prohibited Seller from leaving

---

[42]    *See* Arbitration Hearing at 45, Ex. 11 to Sterken Decl. (arguing that it would be reasonable to expect substitute performance if the Contract read "CIF Manhattan," Manhattan were flooded, and nearby Bridgeport, Connecticut, were open. Macromex shifts the jurisdictional frame of reference from the national level to the state level, but if the states control their ports to some degree, the analogy is apt).

[43]    *See* 146 N.Y.S. 371 (3d Dep't 1914). The Buyer wanted only a specific stand of trees, not a similar stand.

-12-

port.[44]  Buyer was able to demand that Seller hold the goods at its warehouse so that Buyer could retrieve them at that location.

The instant case is closer to the second scenario.  Globex had the product, but could not deliver it.  The best substitution would be delivery to another port, as Globex intended to deliver the product by ship.  In fact, in *Meyer v. Sullivan*, the Seller could not ship at all, but was still required to arrange substituted performance.  Therefore, the arbitrator correctly applied section 2-614.

**B.    The Damages**

Globex argues that if it is liable for the breach, the arbitrator miscalculated the damages.[45]  According to Globex, the damages, calculated in accordance with CISG Article 74, should reflect the market prices in Georgia, not Romania.[46]  Globex reasons that if it breached, it did so by failing to complete the substituted performance (shipping to Georgia), not by failing to ship to Romania, which was impossible.  Because shipment to Romania was impossible, Macromex could not have lost profits based on Romanian market prices.

---

[44]    *See* 181 P. 847 (Cal. App. 1919).

[45]    *See* Cross-Pet. at 2.

[46]    *See id.* at 5.

-13-

The CISG defines damages in Section II, Articles 74 to 77.[47] Article 74 discusses breached contracts; Articles 75 and 76 discuss avoided contracts. Finally, Article 77 discusses mitigation, an issue not raised in this case. Because the arbitrator rejected the force majeure defense, this contract was breached, rather than avoided. As a result, only Article 74 applies.[48]

An unexcused breach fits squarely within Article 74. The arbitrator correctly read Article 74 to determine loss of profit as the amount foreseeable at the signing of the contract.[49]

The arbitrator correctly applied Article 74, finding that "Buyer is entitled to lost profits caused by Seller that were foreseeable at the time of entry

---

[47]    Neither party claims that there should be any remedy in addition to damages.

[48]    CISG art. 74 reads:

Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.

[49]    *See, e.g., Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332 (2d Cir. 1993) (observing that "there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made").

-14-

into the Contracts."[50]  The term "foreseeablity" here is not the same as that used in the second element of force majeure, where it serves to protect the breaching party from unexpected impediments.  The loss of profit foreseeable at the signing of the contract refers to circumstances similar to those raised here – preventing each side from using unforeseeable circumstances to modify the contract.  Just as a Seller cannot require the buyer to pay an unexpected jump in market price for the contracted good, the seller is not required to accept less than the contract price even if the market crashes or a government regulation causes the price to drop.

Because lost profits are determined under the CISG as the amount foreseeable at the time the contract was executed, the arbitrator's calculation of damages was correct.  The lost profits were based on the market value of the chickens in Romania, their intended place of sale.

## V.    CONCLUSION

For the foregoing reasons, Macromex's petition to confirm the award is granted and Globex's cross-petition to vacate the award is denied.  The Clerk of the Court is directed to close these motions [documents no. 1 and 9 on the docket sheet] and this case.

---

[50]    Int. Award at 11.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           April 16, 2008

## - Appearances -

**For Plaintiff**:

James F. Sweeney, Esq.
Nicoletti Hornig & Sweeney
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005
(212) 220-3830

**For Defendant**:

Stanley McDermott III, Esq.
Sarah J. Sterken, Esq.
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4695